## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**NORA CANDELARIA, KIMANI SINGLETON and all others similarly situated under 29 USC § 216(b),**

    *Plaintiffs*,

      **v.**

**HEALTH CARE SERVICE CORPORATION,**

    *Defendant*.

**Case No.** 2:17-cv-404-KG-SMV

**COLLECTIVE AND CLASS ACTION COMPLAINT**

## JOINT MOTION FOR INTERIM/FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT

*/s/ J. Derek Braziel*
J. Derek Braziel
Texas Bar No. 00793380
**BRAZIEL | DIXON, LLP**
1910 Pacific Ave.
Suite 12000 – Box 220
Dallas, Texas 75201
214-749-1400
214-749-1010 (fax)
www.overtimelawyer.com

JACK SIEGEL
Co-Attorney in Charge
Texas Bar No. 24070621
SIEGEL LAW GROUP PLLC
2820 McKinnon, Suite 5009
Dallas, Texas 75201
P: (214) 790-4454
www.4overtimelawyer.com

ATTORNEYS FOR PLAINTIFFS
AND THE SETTLEMENT CLASS

/s/ Mark D. Temple
**MARK D. TEMPLE**
Texas State Bar No. 00794727
Baker & Hostetler, LLP
811 Main Street, Suite 1100
Houston, TX 77002-6110
Telephone: +1 713 751 1600
Facsimile: +1 713 751 1717
mtemple@bakerlaw.com
*Attorney-in-Charge for Defendant*

**ADAM J. WEINER**
Reed Smith LLP
10 S. Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone: +1 312 207 2841
Facsimile: +1 312 207 6400
ajweiner@reedsmith.com

**RANDY S. BARTELL**
Montgomery & Andrews, P.A.
P.O. Box 2307
Santa Fe, NM 87504-2307
Telephone: +1 505 986 2678
rbartell@montand.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed through the Court's CM/ECF filing system on September 8, 2020, and that all counsel will receive notice of this filing through the District of New Mexico's ECF as of that same date.

/s/ J. Derek Braziel
J. Derek Braziel

## CERTIFICATE OF CONFERENCE

I certify that I conferred with opposing counsel about the relief sought in this motion and was advised that Defendant(s) are unopposed to it.

/s/ J. Derek Braziel
J. Derek Braziel

Plaintiffs Nora Candelaria and Kimani Singleton ("Plaintiffs" or "Named Plaintiffs") along with Defendant Health Care Service Corporation ("HCSC" or "Defendant") (collectively "the Parties") move this court for final approval the class action and collective action settlement in this matter, and assert as follows:

## I.      INTRODUCTION

The Parties seek final approval of the proposed Settlement Agreement for class and collective action Claims ("Settlement Agreement" or "Agreement"), previously submitted to the Court as Exhibit 1 to the Motion for Preliminary Approval. (ECF No. 61). Under the terms of the Agreement, Defendant will pay an amount not to exceed the Gross Settlement Amount detailed in the Agreement to resolve all claims brought by the Named Plaintiffs, Opt-In Plaintiffs, and Settlement Class Members (collectively, "Settlement Class Members") – 596 people[1] – under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*, and a Rule 23, opt-out class action brought pursuant to the New Mexico Minimum Wage Act, N.M. Stat. Ann. §50-4-19, *et seq.* ("NMMWA") and the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("Illinois Law") (collectively, "State Wage Law").

Because the proposed Settlement Agreement is "fair, reasonable and adequate," provides Settlement Class Members with sufficient monetary relief and satisfies all other criteria for final approval, the Court should grant this motion. Plaintiffs request the Court enter an Order in the form accompanying this Motion that, among other things: (1) grants final approval of the proposed Settlement Agreement; (2) permanently certifies the Rule 23 Settlement Class for purposes of the settlement only; (3) approves the settlement of claims arising under the FLSA; (4) approves the

---

[1] The initial Class Member list contained 597 individuals. One individual excluded herself from the settlement. The 596 people are identified by name on Attachment 7 of the Claim Administrator's declaration. (Exhibit 1 to this Motion).

payment of Service Awards to the Named Plaintiffs; (5) approves Plaintiffs' Counsel's ("Class Counsel") requested attorneys' fees and litigation expenses/costs (6) approves payment to the Third-Party Administrator; and (7) dismisses this matter with prejudice.

## II.    FACTUAL BACKGROUND AND PLAINTIFFS' ALLEGATIONS

Nora Candelaria began this action on April 3, 2017. (ECF No. 1). She filed the lawsuit to recover alleged unpaid overtime wages under both federal and New Mexico state law. *Id.* Kimani Singleton joined as a Named Plaintiff on September 7, 2017, when claims under Illinois state law were added. (Dkt No. 25). The case was filed as a collective action under the Fair Labor Standards Act and as a Rule 23 class action for the State Wage Law claims. *Id.* Plaintiffs allege that they were salaried workers who worked more than 40 hours per week without receiving overtime pay. *Id.* Defendant denies that any of the Plaintiffs or members of the Settlement Class were improperly classified and that there is any evidence of a willful violation. (ECF No. 26).

Defendant operates through its Blue Cross Blue Shield Divisions in Illinois, Montana, New Mexico, Oklahoma, and Texas (collectively, "BCBS"). Plaintiffs contend Defendant employs individuals to perform "medical management" (sometimes referred to as "care management") work, which includes both "utilization management" and "case management" functions, to attempt to reduce overall costs of care through detection, prevention, early prevention, and care coordination. (ECF No. 25). Plaintiffs claim these functions are performed by individuals working under over a dozen different job titles (collectively "Medical Management Employees" or "MMEs"). *Id.* Plaintiffs assert the primary job duties of MMEs include communicating with and gathering data from members to document members' medical circumstances in Defendant's computer system; inputting member data into Defendant's

computer system; using established guidelines to maximize utilization of plan resources through application of predetermined criteria; providing information to members and providers regarding plan benefits and resources to address members healthcare needs; and working with members and providers to set up medical care. *Id.* Plaintiffs claim the MMEs do not fall under any exemption to state or federal overtime laws. *Id.*

Defendant denies Plaintiffs' allegations and contends that Plaintiffs and all members of the Settlement Class are properly classified under state and federal law. (ECF No. 26).

### III.    COURSE OF LITIGATION

Plaintiffs assert that they have vigorously pursued their personal claims as well as the claims of the class. (Exh. 2, Braziel Dec., ¶ 10). The Court held an initial scheduling conference on May 15, 2017. *Id.* The scheduling order that resulted set a deadline for Plaintiffs to file a Motion for Conditional certification pursuant to the FLSA. *Id.* As the Federal Rules direct, the Parties discussed the possibility of settlement very early in the litigation. *Id.* The Parties agreed to engage in settlement talks, but only after a substantial exchange of information. *Id.*

With the number of different job titles at issue, the Parties started by exchanging information about their understanding of the nature of the work performed by the potential class members. *Id.* at ¶ 11. Defendant provided Plaintiffs with the job descriptions for the positions represented by each of the individuals who had joined the case as well as information about other positions. *Id.* The information included a breakdown of the number of individuals working in each state in each position. *Id.*

The Parties spent several months negotiating over which positions would be included in the Settlement Class. Ultimately, the Parties defined the class of individuals to be included in the Settlement Agreement as:

The "Settlement Class" includes the 579 individuals who are also identified on Exhibit A[2] by coded identification number.  The Settlement Class is comprised of individuals who worked in New Mexico ("New Mexico Class"), individuals who worked in Illinois ("Illinois Class"), and individuals who worked in states other than New Mexico and Illinois ("FLSA Class").  The Settlement Class is comprised of individuals who worked at some point between April 3, 2014, and the present. The FLSA Class is limited to individuals working between April 3, 2015, and the present.

Plaintiffs seek final approval of the Settlement Agreement and final certification of the Settlement Class.  Plaintiffs also seek approval of the settlement of claims arising under the FLSA.

## IV.    NEGOTIATED SETTLEMENT

After the Parties agreed on the scope of the class, they engaged in an informal exchange of information to estimate the alleged damages.  *Id.* at ¶ 13.  This included gathering and reviewing detailed payroll records for the class members.  *Id.*  Defendant provided this information to Plaintiffs, and both Parties created damage models to be used at mediation.  *Id.* On February 13, 2019, the Parties mediated the case in Chicago, Illinois with the assistance of Michael Dickstein.  *Id.*  Mr. Dickstein is an accomplished mediator and over the last 10 years has been one of a handful of mediators to concentrate on wage and hour litigation.  *Id.*  During the mediation, the Parties agreed to do additional work on the damage models, and the mediator adjourned the mediation.  *Id.*  The Parties had several lengthy teleconferences to identify differences in the two models and to reach agreement on the different variables in the models. *Id.*  After several months of working on the damage models, the Parties were able to resume negotiations.  *Id.*  Ultimately, the Parties were able to resolve the matter as set forth in the Agreement, prior to notice being sent to any individuals.  *Id.*  As a result, settlement class

---

[2] This refers to Exhibit A of the Settlement Agreement and not of this document.

members received a notice informing them that the matter had been resolved through settlement and informing them of the amount of funds they could receive by returning the opt-in or claim form.

## V.    SUMMARY OF PROPOSED CLASS SETTLEMENT AND DETAILS ON CLASS NOTICE, WITHDRAWALS, AND OBJECTIONS

The Parties agreed that the proposed monetary settlement would not exceed the Gross Settlement Amount detailed in the Settlement Agreement. (ECF No. 61-1). Although the Settlement Agreement permits Class Counsel to request up to 40% of the common fund (and the Professional Services Agreements with the Opt-In Plaintiffs sets a 40% fee plus costs), Class Counsel is only requesting approval of 35% of the common fund. The Settlement Agreement permits Class Counsel to recover up to $20,000.00 in litigation expenses/costs. However, the amount being requested is $12,819.50. *Id.* The Settlement Agreement allows for payment of the cost of administration for a Third-Party Administrator of up to $40,000.00, but only $15,536.35 is being requested. *Id.* Additionally, the Settlement Agreement contemplates a service payment of $5,000 for each of the two Named Plaintiffs to be drawn from the Gross Settlement Amount. *Id.*

On December 5, 2019, the Court granted preliminary approval of the Settlement Agreement in this case. (ECF No. 62). Thereafter, on January 17, 2020, the Third-Party Administrator ("Analytics") processed the names and addresses of the Settlement Class Members and mailed the approved notice forms to the most current mailing address of the 597 Settlement Class Members via USPS First Class Mail. (Exh. 1, Declaration of Caroline Barazesh for Analytics.) If a Class Member's Notice Packet was returned by the USPS as undeliverable and without a forwarding address, Analytics performed an advanced address search on the addresses by using Experian, a reputable research tool. *Id.* Analytics used the Class Member's name,

previous address, and Social Security Number to locate a current address. *Id.* Thirty-five (35) Notice Packets were returned to Analytics as undeliverable by USPS. *Id.* From the address research, Analytics located twenty-two (22) updated addresses and the Notice Packets were mailed to the updated addresses. *Id.* Three Notice Packets were again returned as undeliverable after the address update. *Id.* In addition, Analytics promptly mailed the Notice Packet to updated addresses provided by USPS, Class Counsel and Class Members. Only sixteen (16) out of 597 Notice Packets mailed (2.7%) were ultimately undeliverable. *Id.*

Settlement Class Members who had not previously opted-in to the Settlement had to return a valid Claim Form and Release Agreement by March 2, 2020 in order to receive a settlement payment from the proposed settlement. *Id.* As of August 28, 2020, a total of 348 valid and timely Claim Form and Release Agreements have been received, a return rate of 58.3%. *Id.* Eleven Claim Form and Release Agreements were received late, after the March 2, 2020 deadline. *Id.* Three Opt-in Plaintiffs did not return a Claim Form and Release Agreement but are still eligible to receive a settlement check. *Id.* Therefore, 351 Settlement Class Members are eligible to receive a settlement check.

In response to the settlement notice, only one individual excluded herself from the settlement, and there were no objectors from Settlement Class Members. *Id.* On February 20, 2020, a *pro se* letter was filed with the Court concerning a group of individuals who sought to object to the settlement because they were not included in the Settlement Class. On March 5, 2020, the Court also vacated the initial setting for the final approval hearing. (ECF No. 64). The Court requested that the Parties respond to the purported objection by March 19, 2020, which they did. (ECF No. 63 and 65). On July 8, 2020, the Court issued an Order finding that the group of pro se individuals did not have standing to object to the settlement. (ECF No. 67).

## VI.   CLASS COUNSEL CONTENDS THE PROPOSED SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

### A.   The Standard for Approving Class Action Settlement Agreements.

Fed. R. Civ. P. 23(e) provides that, before granting final approval of a settlement agreement, the Court must ensure that notice is provided to members of the plaintiff class, then conduct a hearing and thereafter find that the agreement is "fair, adequate, and reasonable." *Jones v. Nuclear Pharmacy, Inc*., 741 F.2d 322, 324 (10th Cir. 1984). "In determining whether the proposed settlement meets the standard for approval, the Court must first be concerned with the protection of the rights of the passive class members." *See* 7B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1979.1 (2d ed. 1986 &. 2001 Supp.); *Johnson v. City of Tulsa*, 2003 U.S. Dist. LEXIS 26379 (N.D. Okla. May 12, 2003).

Decades ago, in *Jones v. Nuclear Pharmacy, Inc*., 741 F.2d 322, 324 (10th Cir. 1984)*,* the Tenth Circuit identified the following four factors that a district court should consider in determining whether a proposed settlement is fair, reasonable, and adequate:

1.   Whether the proposed settlement was fairly and honestly negotiated;
2.   Whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
3.   Whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and,
4.   The judgment of the parties that the settlement is fair and reasonable.

In the ensuing 35 years, those four factors have been consistently applied. *See e.g. Gottlieb v. Wiles*, 11 F.3d 1004, 1014 (10th Cir. 1993); *Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002); *Tennille v. W. Union Co*., 785 F.3d 422, 434 (10th Cir. 2015); *Fager v. CenturyLink Communs.*, LLC, 854 F.3d 1167, 1174 (10th Cir. 2016).

The court also should "ensure that the agreement is not illegal, a product of collusion, or against the public interest." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1994). "The

9

fairness of the negotiating process is to be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and [any] coercion or collusion that may have marred the negotiations themselves.'" *Ashley v. Regional Transp. Dist. & Amalgamated Transit Union Div. 1001 Pension Trust Fund*, 2008 WL 384579, at *5 (D. Colo. Feb. 11, 2008) (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)). "It is the responsibility of the proponents of the settlement to provide sufficient evidence to support a conclusion that the settlement is fair..." *Gottlieb*, 11 F.3d at 1015.

In determining whether to approve a negotiated settlement, the court must examine the agreement as a whole, rather than the individual sections, for overall fairness. As the Ninth Circuit noted:

> While the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties. … If the court discerns a problem with a stipulated agreement, it should advise the parties of its concern and allow them an opportunity to revise the agreement. Ultimately, the district court is faced with the option of either approving or denying the decree … "[T]he settlement must stand or fall as a whole."

*Colorado*, 937 F.2d at 509 (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 630 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983). Further, the assessment of fairness includes:

> a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Justice*, 688 F.2d at 625.

There is strong judicial policy favoring approval of settlements in complex class action lawsuits. "It is well-settled, as a matter of sound policy, that the law should favor the settlement

of controversies." *Grady v. De Ville Motor Hotel, Inc.*, 415 F.2d 449, 451 (10th Cir. 1969); *see, e.g., Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) ("Voluntary conciliation and settlement  are the preferred  means of dispute resolution."); *Wahlcometroflex, Inc. v. Westar Energy, Inc.*, 773 F.3d 223, 229 (10th Cir. 2014) (public policy favors settlements); *In re Integra Realty Res., Inc.,* 262 F.3d 1089, 1102 (10th Cir. 2001); *see also,* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 11:55, at 178 (4th ed. 2002).

However, courts do sometimes reject settlement agreements.  For example, in a New Mexico case, a three-judge panel deciding a Voting Rights Act case out of McKinley County rejected a proposed modified consent decree.  *United States v. McKinley County*, 941 F. Supp. 1062, 1065-1066 (D. N.M. 1996) ("A consent decree is not merely a contract which the court perfunctorily approves upon the parties' request.").

Class Counsel contends the Agreement in this case meets and surpasses the legal standard for final court approval.  For the reasons described below, analysis of each of the factors required by the Tenth Circuit supports granting final approval of the Agreement.

**B.**     **Class Counsel Believes Each Factor Courts Consider in Determining Whether the Proposed Settlement Is Fair, Reasonable, and Adequate Supports Approval of the Agreement.**

1.     The Proposed Settlement Was Fairly and Honestly Negotiated.

In this case, the Parties jointly seek to settle this matter and "[t]here are numerous indicia that the settlement negotiations in this case have been fair, honest and at arm's length." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006).  "First, the parties to this litigation have 'vigorously advocated their respective positions throughout the pendency of the case.'" *Id*. at 693.  Since 2017, the Parties have maintained their respective positions and zealously advocated contested issues regarding overtime wage liability.

11

Class Counsel believes the lengthy nature and detailed scope of the settlement process also indicates a fair and honest settlement was reached. Before formal and extensive litigation began, the Parties began discussing a framework for settlement. (Exh 2, Braziel Dec., ¶¶ 11-15). Given the number of different job titles at issue, the Parties exchanged information on the nature of the work performed by the potential class members. *Id.* at ¶ 11. Defendant provided Plaintiffs with job descriptions for the positions represented by each of the individuals who had joined the case, as well as information about other positions. *Id.* This also included information about how the various titles and job responsibilities had changed during the relevant period and how the legacy positions compared to the current positions. *Id.* The information also included a breakdown of the number of individuals working in each state in each position. *Id.* The Parties spent several months reviewing the information and Plaintiffs' counsel discussed the job descriptions with the Opt-In Plaintiffs. *Id.* It also took several months to negotiate which positions would be included in the Settlement Class and which were properly excluded. *Id.*

After the Parties agreed on the scope of the class, they engaged in an informal exchange of information to estimate the alleged damages. *Id.* at ¶ 13. This included gathering and reviewing detailed payroll records for the class members. *Id.* Defendant provided this information to Plaintiffs and both Parties created alleged damage models to be used at mediation. *Id.* On February 13, 2019, the Parties mediated the case in Chicago, Illinois with the assistance of Michael Dickstein. *Id.* Mr. Dickstein is an accomplished mediator and over the last 10 years has been one of a handful of prominent mediators to concentrate his practice on resolving wage and hour litigation. *Id.* During the mediation, the Parties determined that their models contained different assumptions about certain aspects of the data. *Id.* This meant that the Parties could not negotiate with comparable models which precluded settlement at mediation. The mediator asked

the Parties to work on compromises to the various assumptions in the models so the Parties would be on the same page about variables that were essentially objective. The Parties agreed and the mediator adjourned the mediation. *Id.*

The Parties exchanged models and deconstructed them to determine the accuracy of the data and the assumptions. *Id.* at ¶ 14 The Parties had several <u>lengthy</u> teleconferences to identify differences in the two models and the reach agreement on the different variables in the models. *Id.* After several months of working on the alleged damage models, the Parties were able to resume negotiations. *Id.* During this process, the mediator continued to stay involved and offered to meet again if necessary. *Id.* The Parties engaged in several more rounds of negotiation which also took several more months. *Id.* Ultimately, the Parties were able to resolve the matter as set forth in the Agreement. *Id.*

Each side had its own view of the variables and how they should be treated. *Id.* at ¶ 15. Where the Parties were not able to convince one another to change their positions *in toto*, the Parties generally agreed to use a midpoint, even though it meant significant changes in the amount of damages being calculated. *Id.* There was an understanding on both sides that any of the variables could go the other direction depending on how the available data was analyzed and what data was used. *Id.* On one important variable, Defendant pulled a sample data set to get an idea which side had the stronger position. *Id.* Even though this narrowed the gap between the Parties, it did not eliminate it and the Parties used the mid-point. *Id.* Because there was no way that day-by-day, person-by-person data could be pulled for the whole class using cost-effective, electronic means (as opposed to pulling paper files and entering data), the mid-point compromise was the best way to move forward unless the Parties just agreed to disagree on a variable, which was the case with some variables.

The amount of time, the amount of effort, the detailed review of the information exchanged by both sides, and the amount of back and forth evidence showed that the Parties negotiated fairly and honestly. The settlement came only after a private mediation and many follow up discussions during which detailed and extensive data and methodologies were exchanged. *See Lucas*, 234 F.R.D. at 693.

Finally, the Parties were represented by "counsel with expertise on the [wage and hour laws] and complex class action litigation." *Id*. These factors support the integrity of the parties' settlement negotiations. Where a settlement results from arm's length negotiations between experienced counsel after an exchange of significant informal discovery the Court may presume the settlement to be fair, adequate, and reasonable. *Id*.

        2.    <u>Serious Questions of Law and Fact Exist, Placing the Ultimate Outcome of the Litigation in Doubt.</u>

In evaluating a settlement, "[t]here is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation." Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 11.45 (4th ed. 2002). Although it is not the role of the Court at this stage of the litigation to evaluate the merits, "it is clear that the parties could reasonably conclude that there are serious questions of law and fact that exist such that they could significantly impact this case if it were litigated." *Lucas*, 234 F.R.D. at 693-94. Rather, the Court must evaluate the probable outcome of litigation and the terms of the settlement and then weigh the remedies the class could secure from the settlement against the probable costs and results of litigation while not reaching "any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of

wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625. This case presented several serious questions of both law and fact which could have impacted the outcome of the litigation, and there is far from any guarantee that Plaintiffs "will ultimately prevail on the merits." *McNeely v. Nat'l Mobile Health Care, LLC*, No. CIV-07-933-M, 2008 WL 4816510, at *13, 2008 U.S. Dist. LEXIS 86741 at *36 (W.D. Okla. Oct. 27, 2008).

By way of example, Class Counsel contends that one significant issue in the litigation is whether Defendant had properly classified Plaintiffs as exempt from the overtime requirements of the FLSA and the state laws of Illinois and New Mexico. (Exh. 2, Braziel Dec., ¶ 19). To assess the exemption issue under these laws, a detailed analysis of the job duties performed by the Plaintiffs would have been necessary. *Id.* This would have included an assessment of the amount of time spent performing certain duties and whether those specific duties were exempt. *Id.* Defendant contended that it properly classified these individuals as either professionals (if they had an RN license or comparable advanced degree/training) or as administrative personnel. *Id.* Plaintiffs contended that even if individuals were licensed RNs, their work did not require them to use the skills and knowledge learned in obtaining their RN designation. *Id.* Depending on the outcome of this issue alone, a significant number of individuals stood to recover nothing if the litigation went to conclusion. *Id.*

Another example issue is the number of hours worked by Plaintiffs. *Id.* at ¶ 20. Defendant contended the number of hours over 40 in a week actually worked was minimal, while Plaintiffs contended it was substantial. *Id.* The difference in the outcome of this one factor would have drastically affected the overall amount of the potential recovery. *Id.* If the jury determined Plaintiffs did not work any overtime hours, Plaintiffs would have recovered nothing.

    3.    <u>Class Counsel Believes the Value of an Immediate Recovery Outweighs the Mere Possibility of Future Relief after Protracted and Expensive Litigation.</u>

The Tenth Circuit has stated that the "value of an immediate recovery" means "the monetary worth of the settlement." *Gottlieb*, 11 F.3d at 1015. "That value is to be weighed not against the net worth of the defendant, but against the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation." *Id.; see also, Wilkerson v. Martin Marietta Corp*., 171 F.R.D. 273, 283 (D. Colo. 1997). "By contrast, the proposed settlement agreement provides the class with substantial, guaranteed relief." *Lucas*, 234 F.R.D. at 694; *see also McNeely*, 2008 WL 4816510, at *13, 2008 U.S. Dist. LEXIS 86741, at *37 (finding that the class "is better off receiving compensation now as opposed to being compensated, if at all, several years down the line, after the matter is certified, tried, and all appeals are exhausted"). An evaluation of the benefits of the settlement also must be tempered by the recognition that any compromise involves concessions on the part of the parties. Indeed, the very essence of a settlement agreement is compromise, "a yielding of absolutes and an abandoning of highest hopes." *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

As set forth in the previous section, just two of the many issues in this case present an all-or-nothing (or almost all-or-nothing) proposition for Plaintiffs. Yet, Defendant has agreed to pay a settlement amount to the Settlement Class Members even though Named Plaintiffs, Opt-in Plaintiffs, and Settlement Class Members faced the risk of recovering nothing in continued litigation. The Net Settlement Fund provides for recovery of an appropriately discounted recovery even *after* the payment of attorney's fees, litigation expenses, administration costs, and service payments. (Exh. 2, Braziel Dec., ¶ 21). Class Counsel believes this is fair and adequate result given the risks to the Parties in this litigation. *Id.*

        4.    <u>Class Counsel Believes the Settlement is Fair and Reasonable</u>.

"Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." *Lucas*, 234 F.R.D. at 695; *McNeely,* 2008 U.S. Dist. LEXIS 86741, at *37–*38 (same). One district court in the 10th Circuit put it this way:

> When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable. *See Trief v. Dun & Bradstreet Corp.,* 840 F. Supp. 277 (S.D.N.Y. 1993) ("Absent evidence of fraud or overreaching, courts consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel."). Counsels' judgment as to the fairness of the agreement is entitled to considerable weight. *See Law v. National Collegiate Athletic Ass'n,* 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000).

*Marcus v. State of Kansas*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002).

In support of their appointment as class counsel, Plaintiffs' counsel submitted their qualifications and set forth their experience in this area of the law. (ECF No. 61); (Exh. 2, Braziel Dec., ¶¶ 2-9); (Exh. 3, Siegel Dec., ¶¶ 2-8.. The Court is therefore familiar with Class Counsels' qualifications. As set forth in the previous section and included in Class Counsels' declaration, Class Counsel believes the settlement is fair and reasonable. (Exh. 2, ¶ 21). "Here, the parties' counsel—among whom are attorneys with substantial experience in complex class action litigation and [employment] class actions—unanimously support this settlement." *Lucas*, 234 F.R.D. at 695. As such, this factor further supports granting final approval.

## C. <u>Class Counsel Believes the Court Should Approve the Service Awards to the Named Plaintiffs.</u>

The Settlement Agreement provides for a modest incentive award for each of the two Named Plaintiffs. Incentive awards are typical in class action cases. *See* 4 William B. Rubenstein et al., NEWBERG ON CLASS ACTIONS § 11:38 (4th ed. 2008). Courts have stated that incentive awards for class representatives are justified to give incentive to a class representative to come forward when none are forthcoming, and to compensate a class representative for risks they take and work they perform on behalf of the class. *See UFCW Local 880-Retail Food*

*Employers Joint Pension Fund v. Newmont Mining Corp.,* 352 F. App'x 232, 235–36 (10th Cir. 2009). "[A] class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class." *Id.* at 235; *see also Lucken Family Ltd. Partnership v. Ultra Resources, Inc.*, Case No. 09–cv–01543–REB–KMT 2010 WL 5387559, at *6 (D. Colo. Dec. 22, 2010) ("Courts have held that incentive awards are an efficient and productive way to encourage members of a class to become class representatives, and to reward the efforts they make on behalf of the class.").

According to Class Counsel, the two Named Plaintiffs were among the first individuals to contact Plaintiffs' Counsel about this case. (Exh. 2, ¶ 22). Throughout the litigation, Class Counsel contends they provided factual information and otherwise assisted them with the prosecution of the litigation. *Id.* In addition to the time and effort spent, Class Counsel believes these individuals work in an industry in which the number of companies with this position is limited because of continued consolidation. *Id.* Plaintiffs contend that background checks and ready access to public records information on the Internet make the possibility of lost job opportunities very real in these circumstances. *Id.* Additionally, it is common in these cases for the Named Plaintiffs to agree to a general release of claims, in part, because they are being paid additional consideration in the Settlement Agreement. *Id.* Finally, Class Counsel contends that the requested incentive awards are reasonable and in line with similar awards approved in other cases. *See, e.g., In re Universal Service Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2011 WL 1808038, at *2 (D. Kan. May 12, 2011) (granting $10,000 incentive award to subclass representative); *Lucken Family Ltd. Partnership*, 2010 WL 5387559, at *6 (approving $10,000 award); *Ponca Tribe of Indians*, 2009 WL 2836508, at *2 (approving incentive awards ranging

from $1,000 to $15,000).  Accordingly, the Court should approve the proposed incentive award to the Named Plaintiffs.

### D.   **The Court Should Approve the Parties' Mutual Confidentiality Provision and The Redaction of Settlement Payment Amounts from any Publicly Filed Settlement Agreement.**

The Parties move the Court to approve provisions in the Settlement Agreement that protect the confidentiality of the settlement payment amounts and to allow the Parties to redact these amounts from any version of the Settlement Agreement filed on the record.  The Parties propose that the Court review an unredacted version of the Settlement Agreement *in camera*.

### 1.   The FLSA Does Not Prohibit Confidential Settlements.

The FLSA does not prohibit confidential settlements or require the public filing of privately negotiated settlement agreements.  *See* 29 U.S.C. 201, *et seq*.  While some district courts have found a judicially created public policy favoring the disclosure of FLSA settlement terms, the United States Court of Appeals for the Tenth Circuit has not adopted any such rule, and no court has found a blanket prohibition on confidentiality of FLSA settlement terms.[3]  *See Hawthorn v. Fiesta Flooring, LLC*, Case. No. 1:19-CV-00019 WJ/SCY, 2020 WL 3085921, at *4 (D.N.M. June 10, 2020) (discussing the lack of controlling precedent).  This Court has summarized this policy by noting that FLSA settlement agreements submitted for judicial approval, "may be, at least in part, subject to public exposure."  *Id.*  Where public policy is cited to require disclosure of FLSA settlement terms, courts note the goal of ensuring that employees are "aware[] of their FLSA rights."  *See e.g.*, *Scott v. Titlemax of Tenn.*, No. 2:13-cv-2710-SHL-dkv, 2015 U.S. Dist. LEXIS 181239, at *3 (W.D. Tenn. May 8, 2015) (citations omitted).

---

[3] Notably, the neighboring Fifth Circuit has held explicitly that FLSA settlements do not require judicial approval, which allows private and confidential settlements without restriction.  *Martin v. Spring Break '83 Productions, L.L.C.*, 688 F.3d 247, 255 (5th Cir. 2012).

2.      District Courts Routinely Approve Confidentiality of Settlement Payment Amounts in FLSA Cases.

In practice, district courts in this circuit routinely approve FLSA settlement agreements that protect the confidentiality of at least settlement payment amounts and allow the redaction of settlement amounts from publicity filed agreements.  S*ee e.g. Williamson v. Ameriflow Energy Serves., LLC*, No. 2:15-878 MCA/GJF, 2017 U.S. Dist. LEXIS 77070 (D.N.M. May 22, 2017) (Fouratt, M.J.) *report and recommendation adopted* Dkt. 129 (D.N.M. May 22, 2017) (Armijo, J.) (approving FLSA settlement agreement with broad confidentiality provision and sealing filed settlement agreement entirely); *McGee v. Pilot Thomas Logistics, LLC*, Case No. 16-cv002034, Dkt. 63 (D. Colo. January 9, 2018) (approving confidentiality of settlement payment amount); *Gassel v. American Pizza Partners, L.P.*, Case No. 4-cv-00291-PAB-NYW, Dkt. 116 (D. Colo. Aug. 24, 2016); *Cooper v. OFS 2 Deal 2, LLC,* Case No. 15-cv-01291-RM-NYW, 2016 WL 1071002, at *3 (D. Colo. Mar. 17, 2016) (approving the redaction of settlement payment amount); *Stransky, et al. v. HealthONE of Denver, Inc.*, Case No. 11-cv-02888-WJM-MJM, Order (D. Colo. Nov. 24, 2015); *Lewis v. Bushwood Investments, LLC*, Case No. 13–2610–JAR–JPO, 2015 WL 1523895 (D. Kan. April 3, 2015) (reviewing and approving FLSA settlement agreement under seal); *Porter v. West Side Restaurant, LLC*, Case No. 13–1112–JAR–KGG, 2015 WL 685855 (D. Kan. Feb. 18, 2015) (reviewing and approving FLSA settlement agreement under seal); *Green, et al. v. Drake Beam Morin, Inc.*, Case No. 11-cv-01063-REB-CBS, Order (D. Colo. Oct. 10, 2012); *Curiel v. The Garlic Knot Express*, LLC, Case No. 11-cv-00205-CMA-KLM, Order (D. Colo. Jul. 27, 2011); *Briones v. JNS Const. Serv., LLC*, 2009 U.S. Dist. LEXIS 28384 (D. Colo. April 6, 2009); *Geer v. Challenge Financial Investors Corp*., Case No. 05-CV-1109-DWB, 2007 WL

9724099 (D. Kan. Oct. 12, 2007).[4]  These narrow publicity restrictions do "not undermine the purpose of the FLSA."  *McGee*, Case No. 16-cv002034, Dkt. 63 at 2 (D. Colo. January 9, 2018).

Importantly, the underlying rationale for the policy favoring disclosure is to "give[] notice to future plaintiffs of ***prior allegations of defendants' improper conduct***."  *Blocklin v. Black Pepper Pho, LLC*, No. 14-CV-1252-WJM-KLM, 2014 WL 6819894, at *3 (D. Colo. Dec. 3, 2014). (emphasis added).  Courts are hesitant to enforce confidentiality provisions when they "undermine[ ] the Department of Labor's regulatory effort to notify employees of their FLSA rights."  *Christeson v. Amazon.com.KSDC, LLC*, 2019 WL 354956 (D. Kan. Jan. 29, 2019) (quoting *Dees v. Hydradry, Inc.*, 706 F. Supp.2d 1227, 1241 (M.D. Fla. 2010)).  The policy does not justify a *per se* bar to confidential settlements because district courts at times permit wholly confidential FLSA settlements, even accepting the filing of entire settlement agreements under seal.  *See Williamson*, 2017 U.S. Dist. LEXIS 77070.

The analysis of the United States District Court for the District of Colorado in *Gassell v. American Pizza Partners, L.P.* is instructive.  Case No. 4-cv-00291-PAB-NYW, Dkt. 116 (D. Colo. Aug. 24, 2016).  In *Gassel*, the court applied a strict version of the policy favoring public disclosure but still allowed confidentiality of the settlement payment amount.  The parties first moved to approve an agreement with a broad confidentiality provision that barred all discussion of the settlement itself, and they requested leave to file the entire settlement agreement under seal. The court acknowledged that '[p]rivacy concerns may weigh in favor of redacting certain information from the settlement documents," but found that the parties had not justified a blanket

---

[4] *See also, e.g., David v. Kohler Co.*, No. 1:15-cv-01263-STA-jay, 2019 WL 6719840 (W.D. Tenn. Dec. 10, 2019) (redacting individual plaintiff recovery amounts); *King v. MS Companies, LLC*, No. 2:13-CV-02277-MHH, 2015 WL 3657649, at *3 (N.D. Ala. June 12, 2015) (approving redaction of settlement payment amount); *Medley v. Am. Cancer Soc'y*, 2010 U.S. Dist. LEXIS 75098, at *1-2 n.1 (S.D.N.Y. July 23, 2010); *King v. Wells Fargo Home Mortg.*, 2009 U.S. Dist. LEXIS 129054 (M.D. Fla. July 15, 2009); *Trinh v. JPMorgan Chase & Co.*, 2009 U.S. Dist. LEXIS 16477 (S.D. Cal. Mar. 3, 2009); *Goudie v. Cable Commc'ns, Inc.*, 2009 U.S. Dist. LEXIS 1907 (D. Or. Jan. 12, 2009).

under seal filing. *Gassel v. Amer. Pizza Partners, L.P.*, 2015 WL 5244917, at *5 (D. Colo. Sept. 8, 2015). The parties then filed a renewed motion with a narrowed request. They sought to redact only the settlement payment amounts from the publicly filed agreement and limited the confidentiality provision to restrict disclosure of "the total dollar amount of this Agreement, as well as the specific amount being paid to each Class Member under this settlement." *Id.* Dkt. 112-1 at 6. The defendant explained that the settlement payments were both private and commercially sensitive, and disclosure of the payment amounts could give other non-parties an unfair advantage in future litigation. *Id.* Dkt. 112 at 25-26. The court granted the motion, approved the confidentiality provision, accepted the redacted agreement as the public filing, and reviewed the unredacted agreement *in camera*. *Id.* Dkt. 116.

By contrast, cases in which courts refuse requests for confidentiality frequently contain broader requests, lack justification for proposed redactions, or are otherwise distinguishable from the case at hand. *See e.g. Hoffman v. Poulsen Pizza LLC*, Case No. 15-2640-DDC-KGG, 2016 WL 2848919 (D. Kan. May 16, 2016) (court denied a motion to approve a blanket confidentiality provision and also denied the motion for settlement agreement approval because the class definition was vague); *Blocklin*, 2014 WL 6819894, at *3 (court approved settlement agreement, but parties did not request leave to redact information or to approve a confidentiality provision); *Christenson v. Amazon.com.KSDC, LLC*, Case No. 18-2043-KHV, 2019 WL 354956 (D. Kan. Jan. 29, 2019) (court rejected blanket confidentiality provision that barred discussing the fact of settlement and contained monetary penalties for disclosure); *Helm v. Kansas*, 656 F.3d 1277 (10th Cir. 2011) (court of appeals held that the parties failed to justify a request to seal multiple appendices of exhibits filed in discrimination case; the case did not implicate the FLSA or the confidentiality of settlement agreements).

3.    The Parties' Proposed Confidentiality Provision and Redactions Are Narrowly Tailored to Protect Private and Commercially Sensitive Information While Furthering the Purpose of the FLSA.

In this case, the Parties' Settlement Agreement and their requests for confidentiality are remarkably similar to those approved by the court in *Gassel* and much narrower than those approved by this court in *Williamson*. The Parties here seek no confidentiality of the Plaintiffs' allegations, the Defendant's defenses, or the fact that the Parties settled this case based upon payments made to the Settlement Class Members. The limited redactions regarding the settlement payment amounts are justified to protect the Parties' private and commercially sensitive information. As explained by the defendant in *Gassel*, disclosure of the settlement payment amounts would encourage future litigation and arm future litigants with an unfair competitive advantage by allowing them to benchmark future lawsuits to the value of a prior settlement, likely creating unreasonable litigation expectations in the process.[5] Moreover, the settlement payment amounts may be used to calculate or at least estimate the wages earned by the Settlement Class Members. Indeed, the justification for a partially confidential settlement in this case is much stronger than the justification the parties offered in *Williamson*, in which this court approved a wholly confidential settlement and even sealed the fairness hearing transcript. No. 2:15-cv-00878-MCA-GJF Dkt. 129 (Court relied upon the parties' representation that "[c]onfidentiality is of utmost importance to the Parties.").

---

[5] The public disclosure of settlement payment amounts is not required in other forms of employment litigation, such as cases asserted under Title VII to the Civil Rights Act of 1963, the Family Medical Leave Act, the Americans with Disabilities Act, etc. On the contrary, courts actively encourage confidential settlements in those cases. *See, e.g., United Airlines, Inc. v. McDonald*, 432 U.S. 385, 401, 97 S. Ct. 2464, 2473 (1977) ("Settlements particularly serve the public interest within the confines of Title VII where 'there is great emphasis . . . on private settlement and the elimination of unfair practices without litigation.'"); *Nicholas v. Dep't of Health*, No. 91-1033, 1991 U.S. App. LEXIS 30053, at *17 (10th Cir. Dec. 11, 1991) (stating that "private settlement of claims is not inconsistent with ADEA, even though ADEA incorporates by reference enforcement provisions of Fair Labor Standards Act and private waiver of claims under that Act are precluded").

Allowing for this limited protection of the Parties' sensitive information also would incentivize their settlement, which is a long-held public policy of federal courts. *See Friedland v. Industrial Co.,* 566 F.3d 1203, 1205 n. 1-2 (10th Cir. 2009) (honoring an agreement to keep the amount of a settlement confidential and keeping it under seal); *E&R Venture Partners, Ltd. Liab. Co. v. Park Cent. Plaza 32, Ltd. Liab. Co.*, No. 2:16-cv-02959-RFB-GWF, 2017 U.S. Dist. LEXIS 66634, at *5 (D. Nev. May 2, 2017) ("[P]ublic policy generally favors confidential settlements because they often assist parties in resolving their disputes by mutual agreement."). On the other hand, refusing the Parties' narrow request for confidentiality here could have a chilling effect on settlement of FLSA cases in this court. *See generally Burlington N. & Sante FE Ry. Co. v. Han*, No. 14-CV-69-CVE-PJC, 2015 U.S. Dist. LEXIS 9631, at *14 (N.D. Okla. Jan. 28, 2015) ("Parties would hardly be encouraged to settle lawsuits if they understood that their 'confidential' negotiations were not confidential at all.").[6]

Moreover, this case is particularly suited for limited confidentiality of the settlement amounts because the class definition includes all employees in the job classes who could have a claim against the Defendant related to the policies or practices challenged by the Plaintiffs. These employees are included in this settlement and received notice *after* settlement was reached, meaning they received notice of the allegations, as well as notice that the matter had already settled and that they would receive a certain amount of money if they returned an opt-in or claim form.

---

[6] To encourage settlement, district courts even approve confidentiality provisions as part of Rule 23 class action settlements of both employment discrimination and wage and hour claims. *See, e.g., Colabufo v. Cont'l Cas. Co.,* No. 04-CV-1863 (TCP) (MLO), 2009 U.S. Dist. LEXIS 807, at *2 (E.D.N.Y. Jan. 6, 2009) (preliminarily approving a Rule 23 class action settlement of ADEA claims, finding the "[t]he *Confidential* Settlement Agreement and Release of All Claims, including its attached Class Notice, Opt-Out Statement, and Claim Form and Release . . . is fair, reasonable and adequate") (emphasis added); *Williams v. Aramark Sports*, LLC, No. 10-1044, 2011 U.S. Dist. LEXIS 102173, at *37 (E.D. Pa. Sep. 8, 2011) (granting final approve of the settlement of federal and state wage and hour claims, stating "[t]he *Confidential* Stipulation of Settlement submitted by the parties is finally approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure as fair, reasonable and adequate and in the best interests of the Class, and the parties are directed to consummate the Stipulation in accordance with its terms") (emphasis added).

Therefore, the public policy interest in ensuring employees are aware of their FLSA rights was satisfied upon receipt of the notice. Any of Defendant's employees not included in the Settlement Class will still have full access to the Plaintiffs' allegations and the fact that the case settled with Defendant paying a monetary sum to each Settlement Class Member who opted into the lawsuit. *See Blocklin*, 2014 WL 6819894, at *3 (the core justification of restricting confidentiality in FLSA settlements is to allow other employees to discover the allegations against their employer). Therefore, the value of public disclosure is unusually limited, and the value of encouraging settlement is remarkably strong. For these reasons, this Court should approve the Parties' confidentiality provision and allow any public filing of the Settlement Agreement with the settlement payment amounts redacted.[7]

###        E.        The Settlement Allocation Process.

During the August 12, 2020, conference concerning the final approval process, the Court requested more information concerning the allocation of the settlement fund among the Settlement Class Members. The allocation process begins with the alleged damage model which was jointly constructed by the Parties as part of the settlement negotiation process set forth in Section IV, *supra.* (Exh. 2, ¶ 22). For each individual, the model uses his/her specific dates of employment, specific rates of pay, and accounts for the individual's absences from work. *Id.* The model calculates a damage amount for each individual, based on his/her specific information. *Id.* For example, an individual who works three months will have a lower damage number than someone who works nine months, even if they were paid the same salary and had no absences from work. *Id.* The model also accounts for differences in the applicable state wage laws under which the

---

[7] If the Court rules that the any of the confidentiality provisions described above are invalid, the Parties request that the Court issue an order striking those provisions rather than requiring the Parties to revise the Agreement and resubmit it to avoid even more delay in the class getting paid.

Class Members worked. *Id.* For example, the NMMWA provides for treble damages as a matter of right where the FLSA provides for liquidated damages which can be avoided altogether is an employer acted in good faith and had reasonable grounds for paying employees in the manner they were paid. *Id.* This means that an individual working in New Mexico will have a higher damage number assigned than an individual working in Texas, even if their dates of employment, rate of pay, and record of absences are identical. *Id.* In short, the model accounts for as many of the differences among individuals as possible based on objective data and applicable law. *Id.*

Once the individual amounts are calculated, they are totaled together. *Id.* Next, each individual amount is divided by the total of the individual amounts to determine what the pro-rata percentage is. *Id.* This percentage is then multiplied against the Net Settlement Fund to determine the amount the individual will receive from the fund. *Id.*

**F.    The Court Should Enter an Interim Order to Accommodate the Requirements of the Class Action Fairness Act.**

The Class Action Fairness Act ("CAFA") requires that defendants who settle any class action in federal court provide notice of the settlement to the federal and relevant state governments. *See* 28 U.S.C. §1711. The notices must be sent (1) within 10 days after the proposed settlement is filed in court (28 U.S.C. §1715(b)), and (2) at least 90 days before final approval is granted (28 U.S.C. §1715(d)). In this case, the CAFA notices did not go out in accordance with these deadlines due to a miscommunication. When the miscommunication came to light the notice issue was immediately remedied, with notices sent on August 27, 2020. Although sent more than 10 days after the settlement, courts hold that the notice requirement is substantially complied with where the notices are sent at least 90 days before final approval is granted. *See Thomas v. Magnachip Semiconductor Corp.*, 2017 U.S. Dist. LEXIS 189971, at *5 (N.D. Cal. Nov. 16, 2017) ("Although Avenue Capital's notice was late, it is sufficient as long as

the relevant state and federal officials have at least ninety days to review the proposed settlement."); *Jakosalem v. Air Serv Corp.*, 2015 U.S. Dist. LEXIS 117235, at *2-3 (N.D. Cal. Sep. 2, 2015) (holding notice requirements substantially complied with when the relevant state and federal officials have had 90 days to review the proposed settlement, even though late).

Final approval of the settlement has been delayed by several months because of issues related to COVID-19 and the filing of an objection by individuals who lacked standing to object. To expedite getting this matter completely closed without taking up more of the Court's time, the Parties propose that the Court enter the attached Interim/Final Approval of Class and Collective Action Settlement. Such order approves the Settlement on all the criteria on an interim basis, and becomes final upon expiration of the relevant 90 day CAFA period. If any issues are raised by any state or federal officials, then the Interim Order stays in place until the issues are addressed.

### G.    Class Counsel's Requested Fee.[8]

Although the Professional Services Agreement between Class Counsel and their clients provides for a 40% contingency fee and the preliminarily approved Settlement Agreement allows for the same, Class Counsel are requesting a fee of 35% of the common fund. As set forth below, Class Counsel contend this represents a reasonable fee and should be approved by the Court. Defendant does not oppose this request.

During the past three (plus) years of litigating this case, Class Counsel represent that they have not been paid for their services. (Exh. 2, ¶ 27). They describe their unpaid work to date as including: (1) interviewing witnesses and selecting class representatives; (2) preparing and filing the complaint and amended complaints; (3) drafting the collective action certification motion; (4) engaging in extensive informal discovery for purposes of mediation; (6) reviewing documents

---

[8] This section contains the positions, contentions, and arguments of Class Counsel. Defendant is not opposing Class Counsel's fee request.

related to job duties and time keeping; (7) analyzing pay records of 597 Settlement Class Members; (8) participating in extensive settlement discussions; (9) preparing and circulating a detailed mediation statement and damages model; (10) analyzing and preparing rebuttal arguments to Defendant's mediation statement; (11) participating in a face-to-face mediation facilitated by private mediator Michael Dickstein; (12) preparing and drafting settlement papers including motions for preliminary approval and for final approval; and (13) overseeing the Claims Administrator in the administration of Settlement Notices and claims. *Id.* In addition, Class Counsel state that they advanced all litigation expenses and costs on behalf of the Class in pursuit of their claims. *Id.* Class Counsel explain herein that their efforts have been without compensation and their entitlement to be paid has been wholly contingent on obtaining recovery for the Plaintiffs. *Id.*

The Court preliminarily approved the Settlement Agreement—an agreement agreed to by the Class Representatives on behalf of the Class and by the Defendant. ECF No. 62. The preliminarily approved Settlement Agreement provides that Class Counsel will recover 35% of the settlement amount. ECF No. 62, ¶ 8. The Settlement Agreement provides express authority for the requested fees and expense awards. The requested fee percentage, 35% of the settlement amount, is less than the 40% contingency fee negotiated between Plaintiffs and the attorneys whom the Court appointed as Counsel. Accordingly, Class Counsel contend an award of 35% of the settlement amount is appropriate, and Defendant does not oppose such request.[9]

      1.      <u>Class Counsel's Position is that the Tenth Circuit and District Courts in the Tenth Circuit Overwhelming Use the Percentage of Fund Method to Determine Reasonable Fees.</u>

---

[9] *See Manners v. Amer. Gen. Life Ins. Co.*, 199 U.S. Dist. LEXIS 22880, at *84 (M.D. Tenn. 1999) (where fees are settled and the court determines that fee settlement amount was produced via arms-length bargaining, "the Court gives great weight to the negotiated fee in considering the fee and expense request.");

Under Federal Rule of Civil Procedure 23(e), the "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." In 2003, Rule 23(h) was adopted to more specifically address fee awards in the class action setting. Rule 23(h) states, in relevant part, that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law .... " FED.R.CIV.P 23(h). Generally, the Tenth Circuit reviews a district court decision awarding attorneys' fees for an abuse of discretion. *Pelican Prod. Corp. v. Marino,* 893 F.2d 1143, 1148 (10th Cir.1990).

Class Counsel contend that their efforts have resulted in a common fund, which is set forth in the Settlement Agreement. For over 40 years, the Supreme Court has held that when counsel obtain a common fund settlement, they may seek a reasonable attorneys' fee from the fund as whole. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980); *Blum v. Stenson,* 465 U.S. 886, 900 n.l6 (1984) (in common fund cases, "a reasonable fee is based on a percentage of the fund bestowed on the class."). The rationale behind allowing the Court to award attorneys' fees out of the common fund is that class counsel conferred a benefit to the class as a whole and should be compensated for that benefit. "A litigant or a lawyer who recovers, preserves, or increases the value of a common fund, thereby benefitting other persons, may be reimbursed for reasonable fees and expenses from the fund as a whole." *Boeing Co. v. Van Gemert,* 444 U.S. at 478. The court awards class counsel a fee from the common fund based upon the court's analysis of the benefit and value the attorney added in obtaining the settlement for the class; the court "weighs the interests of the class in light of class counsel's efforts on their behalf." *In re Copley Pharm., Inc.,* 1 F. Supp. 2d 1407, 1409 (D. Wyo. 1998).

Here, the reasonableness of the fee is tested under federal common law since federal claims were alleged and carry with them federal question jurisdiction.[10]  This methodology calculates the fee as a reasonable percentage of the value obtained for the benefit of the class.  *See Id.* at 454.  The Tenth Circuit has expressed a preference for determining the reasonableness of a fee award in a common fund case utilizing the percentage of recovery method.  *See Gottlieb*, 43 F.3d at 483; *Brown*, 838 F.2d at 454.  Courts in this District have acknowledged this preference and rejected the application of lodestar analysis or a lodestar cross check when applying the percentage of fund method.  As Judge Parker recently explained:

> The percentage of the fund method is the appropriate means to determine a reasonable fee ... a lodestar analysis would not be helpful in setting or even evaluating a reasonable percentage of the Common Fund….  The percentage approach is also more efficient. Importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers.

*Ramah Navajo v. Jewell*, 167 F. Supp. 3d at 1241–42 (D.N.M. 2016).  Other New Mexico judges, including Judge Gonzales, similarly use the percentage of fund method and do not require a lodestar crosscheck, which is significantly more work for the Parties and the courts.  *Barela v. Citi Corp.*, No. 1:11-cv-506-KG-GBW, ECF 93 (D.N.M Sept. 15, 2014) (awarding percentage of fund totaling $133,333.33 in hybrid FLSA and Rule 23 wage and hour case without lodestar cross check) (Gonzales, J.) (Exh. 3, Siegel Decl., Attachment 7); *see also, Ramah Navajo Chapter v. Babbitt*, 50 F. Supp. 2d 1091, 1097 (D.N.M. 1999) (fee awards "in common fund cases ***should be evaluated*** using the percentage of fund method ***without a lodestar analysis***.") (emphasis added);

---

[10] In *Chieftain Royalty Co. v. EnerVest Energy Institutional Fund XIII-A, L.P., et al.*, 861 F.3d 1182 (10th Cir. 2017), a two-judge panel of the Tenth Circuit held that, in diversity class-action cases, the federal court should look to state law for determining the reasonableness of class counsel's fee award.  Unlike *Nieberding* and *Chieftain v. EnerVest,* this case was not a diversity case.  So, the Court should use the percentage of the common fund method to determine reasonableness of the fee request, which the Tenth Circuit has used for decades.

*Ramah Navajo Chapter v. Kempthorne*, Case No. CIV 90-0957 LH/KBM2008 WL 11342943, at

*5 (D.N.M. Aug. 27, 2008) (approving percentage without lodestar cross check); *Robles v. Brake*

*Masters Sys., Inc.*, Case No. CIV 10–0135 JB/WPL2011, WL 9717448, at *19 (D.N.M. Jan. 31,

2011) (approving fee <u>without</u> lodestar cross check, where counsel reduced contingency fee for

settlement and the percentage requested was "within the range that other courts within the Tenth

Circuit have approved); *Acevedo v. Sw. Airlines Co*., 1:16-CV-00024-MV-LF, 2019 WL 6712298,

at *1 (D.N.M. Dec. 10, 2019) (approving 33% award <u>without</u> lodestar analysis or lodestar

crosscheck in wage and hour hybrid action), *report and recommendation adopted*, 2020 WL 85132

(D.N.M. Jan. 7, 2020); *Ramah Navajo Chapter v. Kempthorne*, 2008 WL 11342943, at *5 (D.N.M.

Aug. 27, 2008) (approving fee <u>without</u> lodestar cross check); Siegel Decl., Attachment 1, *Daye v.*

*Cmty. Fin. Serv. Ctrs., LLC*, 1:14-cv-759-KK-KBM, ECF 195 (D.N.M. August 15, 2019)

(awarding $440,000 fee <u>without</u> lodestar analysis); s*ee* Siegel Decl., Attachment 2, *J.O. v. Dorsey,*

*et al*., No. 1:11-cv-254-MCA-GBW, ECF 157 (D.N.M. Nov. 19, 2014) (awarding 1/3 fee of fund,

or $250,000 <u>without</u> lodestar analysis); *see* Siegel Decl., Attachment 3, *Willett v. Redflex Traffic*

*Systems, Inc.*, No. 1:13-cv-1241-JCH-LAM (D.N.M. Nov. 24, 2016) (awarding $1,210,605.98 out

of a $3.5 million dollar fund <u>without</u> lodestar cross check); *see* Siegel Decl., Attachment 4, *Dejolie*

*v. T&R Market, Inc*., No. 1:17-cv-733-KK-SCY (D.N.M. Dec. 10, 2018) (awarding fees of

$190,000 using the "percentage of fund method" <u>without</u> lodestar analysis); *see* Siegel Decl.,

Attachment 5, *Jones v. I.Q. Data Int'l, Inc*., No. 1:14-cv-130-PJK-GBW, ECF 65 (awarding 30%

of common fund <u>without</u> lodestar analysis); s*ee* Siegel Decl., Attachment 6, *Yazzie v. Gurley Motor*

*Co*., No. 1:14-cv-555-JAP-SCY, ECF 196 (D.N.M. Oct. 28, 2016) (awarding $173,750 as a

percentage of fund <u>without</u> lodestar cross check).  District courts within the Tenth Circuit but

outside of New Mexico agree. *Chieftain Royalty Co. v. Marathon Oil Co.*, 2019 WL 7758915, at

*9 (Mar. 8, 2019) (E.D. Okla. Mar. 8, 2019) (awarding 40% fee without lodestar cross check, explaining that the "lodestar method and lodestar cross-checks are a wasteful use of resources and are disfavored by the Tenth Circuit.") (collecting cases); *CompSource Oklahoma v. BNY Mellon, N.A.*, 2012 WL 6864701, at *8 (E.D. Okla. Oct. 25, 2012) ("A majority of circuits recognize that trial courts have the discretion to award fees based solely on a percentage of the fund approach and are not required to conduct a lodestar analysis in common fund class actions.") (citing *Union Asset Mgmt. Holding A. G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012)); *Fankhouser v. XTO Energy, Inc.*, 2012 WL 4867715, *3 (W.D. Okla. Oct. 12, 2012) (awarding 36% without lodestar cross check); *Droegemueller v. Petroleum Devel. Corp.,* 2009 WL 961539, *4 (D. Colo. Apr. 7, 2009) (awarding 33 1/3% without a lodestar cross check); *Lewis v. Wal–Mart Stores, Inc.,* 2006 WL 3505851, *2 (N.D. Okla. Dec. 4, 2006) (awarding 33 1/3% without calculating lodestar); *Williams v. Sprint/United Mgmt. Co.*, 2007 WL 2694029, at *6 (D. Kan. Sept. 11, 2007) (awarding 35% fee without calculating lodestar); *Peck v. Encana Oil & Gas, Inc.*, , 2018 WL 1010944, at *3 (D. Colo. Feb. 22, 2018) (37.5% fee without calculating lodestar in wage and hour hybrid action); *Farley v. Family Dollar Stores, Inc.*, 2014 WL 5488897, at *4 (D. Colo. Oct. 30, 2014) (30.3% fee without lodestar cross check in wage and hour hybrid action); *Chavez Rodriguez v. Hermes Landscaping, Inc.*, 2020 WL 3288059, at *5 (D. Kan. June 18, 2020) (33% fee without calculating lodestar in wage and hour hybrid action); *Whittington v. Taco Bell of Am., Inc.*, 2013 WL 6022972, at *6 (D. Colo. Nov. 13, 2013) (fees and costs of 39% of the fund without lodestar analysis in wage and hour hybrid action without lodestar cross check) (citing *Stuart J. Logan et al.*, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 167, 167 (2003) (reporting that the percentage of class recovery consumed by attorneys' fees in cases under $10 million averages between 30.4% and 31.9%, based on a survey of 1,120 cases).

Class Counsel contend that this Court should follow the direction provided by the Tenth Circuit and other district courts in this Circuit and use the percentage of fund method for awarding Class Counsels' attorneys' fees in this case, and Defendant does not oppose this request.

> 2.    Class Counsel's Position Is that the Requested Fee Award Is Well Within the Range of Percentage of Fund Awards.

In selecting an appropriate percentage award, the Supreme Court recognizes that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for their services in the marketplace. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989). Class Counsel's request for an award of attorneys' fees equal to 35% of the common fund is well within the range of prior percentage awards made by courts in this District and in the Tenth Circuit. *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1257 (D.N.M. 2012) ("Fees in the range of 30–40% of any amount recovered are common in complex and other cases taken on a contingency fee basis."); *Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *1–2 (D. Colo. Apr. 28, 2017) (explaining forty percent fee falls within acceptable range in Tenth Circuit); *Shaw v. Interthinx, Inc.*, 2015 WL 1867861, at *6 (D. Colo. Apr. 22, 2015) (finding 1/3 of $6 million dollar fund, or $2 million, in wage and hour case to be "well within the percentage range approved in similar cases") (collecting cases); *Campbell v. C.R. England, Inc.*, , 2015 WL 5773709, at *6 (D. Utah Sept. 30, 2015) (awarding 1/3 of $5,000 fund in FLSA collective action). *Blanco v. Xtreme Drilling & Coil Services, Inc.*, 2020 WL 4041456, at *5 (D. Colo. July 17, 2020) (awarding 38% fee of $850,000 settlement in wage hybrid action because it was in "line with the customary fees and awards in similar cases"); *Peck*, 2018 WL 1010944, at *3 (D. Colo. Feb. 22, 2018) (finding 37.5% fee in wage and hour hybrid action to be "well within the range for a contingent fee award") (collecting cases); *Farley.*, 2014 WL 5488897, at *4 (D. Colo. Oct. 30, 2014) (30.3% fee of $2.3 million fund in wage and hour hybrid action); *Whittington,* 2013 WL 6022972, at * 6 (explaining

that the fees and costs of 39% of the fund were "within the normal range for a contingent fee award" in wage and hour hybrid class action); *Shaulis v. Falcon Subsidiary LLC*, 2018 WL 4620388, at *2 (D. Colo. Sept. 26, 2018) (finding 1/3 of common fund to be reasonable because the award was similar to fee awards in "similar wage and hour cases in this District"); *Williams*, 2007 WL 2694029, at *6 (awarding 35% fee in employment class action); 4 *Newberg On Class Actions* § 14:6 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery."); *Enegren v. KC Lodge Ventures LLC*, 2019 WL 5102177, at *9 (D. Kan. Oct. 11, 2019) (awarding 40% of fund in wage collective action); In re Bank of Am. Wage & Hour Employment Litig., 10-MD-2138-JWL, 2013 WL 6670602, at *3 (D. Kan. Dec. 18, 2013) (awarding 18.25 million plus up to $900,000 in costs from $73 million dollar settlement fund in hybrid wage case).

Class Counsel contends that a 35% fee award is also consistent with the percentage of fund awards in hybrid Rule 23 state wage and hour/FLSA actions nationwide. *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 472 (S.D.N.Y 2013) (awarding $1.617 million in attorneys' fees in $4.9 million common fund settlement of overtime claims) (citing *Willix v. Healthfirst, Inc.,* No. 07 Civ. 1143, 2011 WL 754862, at *4 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million settlement fund in FLSA and NYLL wage and hour action); and *Clark v. Ecolab, Inc.,* No. 07 Civ. 8623(PAC), 2010 WL 1948198, at *8–9 (S.D.N.Y. May 11, 2010) (awarding 33% of $6 million settlement fund in FLSA and multi-state wage and hour case); *Lenahan v. Sears, Roebuck & Co*., CIV. 02-0045, 2006 WL 2085282, at *19 (D.N.J. July 24, 2006) aff'd, 266 Fed. Appx. 114 (3d Cir. 2008) (awarding 30% fee in $15 million common settlement of federal and state wage claims, noting that "attorneys' fees of approximately 30 percent are commonly awarded in labor and employment class actions"); *Khait*, 2010 WL 2025106, at *9 (awarding class counsel 33% of $9.25

million settlement fund in FLSA and 13 state wage and hour law off-the-clock case); *Duchene v. Michael Cetta, Inc.,* 2009 WL 5841175, at \*3 (S.D.N.Y. Sept. 10, 2009) (awarding class counsel 32.2% of $3,150,000 fund in hybrid tip misappropriation case); *Mohney v. Shelly's Prime Steak,* 2009 WL 5851465, at \*5 (S.D.N.Y. Mar. 31, 2009) (awarding 33% of $3,265,000 fund in hybrid wage case); *Stefaniak v. HSBC Bank USA, N.A.*, 2008 WL 7630102, at \*3 (W.D.N.Y. June 28, 2008) (awarding 33% of $2.9 million fund in hybrid wage case); *Abadeer, et al., v. Tyson, et al.* 3:09-cv-125 (M.D. Tenn. Oct. 17, 2014) (awarding fees in the amount of $2,583,333.00, which was equal to 33.33% of the common fund, in hybrid FLSA Rule 23 class action); *Camp v. The Progressive Group,* No. 01–2680, 2004 WL 2149079, at \*22 (E.D. La. Sep.23, 2004) (approving $1,600,000.00 in attorneys' fees from $5,400,000.00 settlement fund in wage and hour action) (citing *Braun v. Wal–Mart, Inc.,* 2009 WL 1592532 (Minn. Dist. Ct. June 1, 2009) (38% fee award in a $54 million settlement)).[11]

        3.    <u>Class Counsel's Argument on the Standard for Assessing Fee Awards in Tenth Circuit.</u>

---

[11] *See also Dillworth v. Case Farms Processing, Inc.*, 2010 WL 776933, at \*7 (N.D. Ohio Mar. 8, 2010) (approving attorneys' fee award of one-third of the total settlement amount in hybrid FLSA and Ohio and North Carolina state classes); *Kritzer v. Safelite Solutions*, LLC, 2012 WL 1945144 (S.D. Ohio May 30, 2012) (approving attorneys' fees and costs up to 52% of total recovery for hybrid FLSA collective and Ohio class action for unpaid overtime); *Simpson v. Citizens Bank*, No. 12-10267, 2014 WL 12738263, at \*6 (E.D. Mich. Jan. 31, 2014) ("Class Counsel's request for 33% of the common fund created by their efforts is well within the benchmark range and in line with what is often awarded in this Circuit."); *Abadeer, et al., v. Tyson, et al.* 3:09-cv-125 (M.D. Tenn. Oct. 17, 2014) (awarding fees in the amount of $2,583,333.00, which was equal to 33.33% of the common fund, in hybrid FLSA Rule 23 class action); *Clem v. KeyBank, N.A.*, 2014 U.S. Dist. LEXIS 87174 (S.D.N.Y. June 20, 2014) (awarding 1/3 of common fund for attorneys' fees); *Henry v. Little Mint, Inc.*, 2014 U.S. Dist. LEXIS 72574 (S.D.N.Y. May 23, 2014) (same); *Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc., 2013 U.S. Dist. LEXIS 152087* (W.D. Wis. Oct. 23, 2013) (same); *Hernandez v. Merrill Lynch & Co.*, 2013 U.S. Dist. LEXIS 42681 (S.D.N.Y. Mar. 21, 2013) (same); *Chance, et al., v. E.I. Dupont*, 1:16-cv-376 (E *Clem v. KeyBank, N.A.*, 2014 U.S. Dist. LEXIS 87174 (S.D.N.Y. June 20, 2014) (awarding 1/3 of common fund for attorneys' fees); *Henry v. Little Mint, Inc.*, 2014 U.S. Dist. LEXIS 72574 (S.D.N.Y. May 23, 2014) (same); *Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc., 2013 U.S. Dist. LEXIS 152087* (W.D. Wis. Oct. 23, 2013) (same); *Hernandez v. Merrill Lynch & Co.*, 2013 U.S. Dist. LEXIS 42681 (S.D.N.Y. Mar. 21, 2013) (same); *Chance, et al., v. E.I. Dupont*, 1:16-cv-376 (E.D. Tex., March 6, 2019) (approving 1/3 contingency fee in hybrid FLSA Rule 23 case); *Legros v. Mud Control Equip., Co.*, C.A. No. 15-1082, 2017 LEXIS 32723 \*10 (W.D. La.,March 6, 2017) (approving contingency fee of 40% in collective action); *Barnard et al v. Interek USA, Inc.,* No. Civ. A. 4:11-cv-02198 (S.D. Tex., Jan. 8, 2014); Doc. 184 (same); *Green-Johnson v. Fircroft, et al,* No. Civ. A. 4:12-cv-01307 (S.D. Tex., April 3, 2013); Doc. 50 (same).

In *Gottlieb,* the Tenth Circuit directed that in determining a reasonable fee in a common fund case, "the court must consider the twelve *Johnson* factors" originally set forth by the Fifth Circuit. *Gottlieb,* 43 F.3d at 483 (citing *Johnson v. Georgia Highway Express.* Inc. 488 F.2d 714, 717-19 (5th Cir. 1974):

> The 12 Johnson factors are: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee: (6) any prearranged fee -- this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation , and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client: and (12) awards in similar cases.[12]

Because the *Johnson* factors were developed in the context of a judgment in a case involving fee-shifting statute, the Tenth Circuit held that the scheme should be modified when applied in a common fund case to better fit the setting. *See Brown v. Phillips Petroleum Co*., 838 F.2d 451, 456 (10th Cir. 1988). Not all factors will apply in every case. *Id*., at 456; *Gudenkauf v. Stauffer Communications, Inc*., 158 F.3d 1074, 1083 (10th Cir. 1998) (trial court need not specifically address each factor in every case). And the weight to each factor varies when the court is awarding fees from a common fund. *Brown*, 838 F. 2d at 456.

Class Counsel believes the most important difference in the application of the *Johnson* factors in common fund cases is the emphasis placed on the eighth factor—the result obtained by class counsel. In a common fund case, the result obtained is *the* most important factor and deserves the greatest weight. *Brown*, 838 F.2d at 456 (holding this factor may be given greater weight when "the recovery [is] highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class.")*.* As the Advisory Committee later put it when adopting the 2003

---

[12] *Id.* at 482, n.4.

amendments to Rule 23, "[f]or a percentage fee approach to fee measurement, results achieved is the basic starting point."  FED. R. CIV. P. 23(h) advisory committee's note (2003).

Class Counsel believes the other important difference in this common-fund context is the diminished role of the first *Johnson* factor—the time and labor involved.  In *Brown*, the Tenth Circuit recognized that the differences between common fund cases and statutory fee cases cautioned against importing a formal lodestar requirement—the usual *starting* point in statutory fee-shifting cases—into common fund cases.  Accordingly, the Tenth Circuit recast the nature of the "time and labor" inquiry in common fund cases.  While "time and labor" is a factor to be considered, the court need not conduct a lodestar analysis to assess it.[13]

In the context of this case, Class Counsel argues that the result achieved should be given the greatest weight in determining the reasonableness of the fee request.  *Brown*, 838 F.2d at 456; *see also Farrar v. Hobby*, 506 U.S. 103, 114 (1992) ("[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained.") (quotations omitted); *Behrens v. Wometco Enters.*, Inc., 118 F.R.D. 534, 547048 (S.D. Fla. 1988) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."), *aff'd*, 899 F.2d 21 (11th Cir. 1990).  Further, because the recovery was highly contingent and the efforts of counsel were instrumental in realizing recovery on behalf of the class, this factor should be given even greater weight.  *In re Qwest Communications Intern., Inc. Sec. Litig.*, 625 F. Supp. 2d 1143, 1151 (D. Colo. 2009) (citing *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988).

---

[13] *See* Section F, 1, *supra* (citing Tenth Circuit cases in which Courts awarded fees without lodestar cross check); *see also Brown*, 838 F.2d at 456 & n.3; *Chieftain Royalty Co. v. XTO Energy, Inc.,* No. CIV-11-29-KEW, 2018 WL 2296588, at *3 (E.D. Okla. Mar. 27, 2018) (neither lodestar analysis nor lodestar cross-check is required); *Childs v. Unified Life Ins. Co.*, No. 2011 WL 6016486, *15 n.10 (N.D. Okla. 2011) ("Because the other *Johnson* factors, combined, warrant approval of the common fund fee sought by Plaintiff's Counsel, the Court need not engage in a detailed, lodestar-type analysis of the 'time and labor required' factor.").

In determining the reasonableness of attorneys' fees, courts have considered the comparative data about class settlements summarized in *Shaw v. Toshiba America Information Systems, Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000), which stated as follows:

> The most complete analysis of fee awards in class actions conducted to date was conducted by the National Economic Research Associates, an economics consulting firm. The data is reported at Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, Recent Trends III: What Explains Settlements in Shareholder Class Actions? (NERA, June 1995) (hereinafter "NERA Study"). This data indicates that regardless of size, attorneys' fees average approximately 32% of the settlement.

*Id.* at 988 (citing NERA Study at 7) (emphasis added).

The NERA Study relied upon in *Shaw* showed that the average result achieved for class members was a small percentage of claimed damages. Unlike many class action settlements that provide little if any actual monetary benefit to the class members, Class Counsel argue that the settlement reached here provides real and substantial monetary recovery to the class. Class Counsel contend that they achieved a significant cash recovery and with a substantial average payment per class member, despite the existence of serious disputes as to liability and the appropriateness of class/collective certification. The fact that only one member of the Settlement Class elected to be excluded from the settlement to the settlement should bolster the court's confidence in the fairness of the results Class Counsel obtained. *Nakamura*, 2019 WL 2185081, at *2.

While Class Counsel believe that the class claims have substantial merit, if litigation were to proceed, there is, nonetheless, a significant risk that the Settlement Class could recover less than the amount of settlement, or nothing at all. The obstacles to victory on a class-wide basis were numerous and varied. For example, Defendant made clear to Plaintiffs it would rely heavily on *Williams v. Genex Services*, LLC, 809 F.3d 103 (4th Cir. 2015), to establish that Plaintiffs are

exempt and not entitled to any overtime pay.  In *Genex,* the Fourth Circuit held that "medical case management" work performed by a managed care worker, who did not provide hands-on patient care, but who interacted with medical providers and employees to ensure the provision of effective health care services while maximizing cost containment was an exempt professional.  The risk of facing the same fate as the *Genex* plaintiffs, *who ended up with nothing*, was a driving factor in reaching this settlement, for it meant that even if Plaintiffs won at the trial court level, Defendant would have certainly appealed to the Tenth Circuit.

Four of the *Johnson* factors examine, in different ways, whether the fee request is consistent with the market for legal representation of this type.[14]  This makes sense in that absent Class Members do not have an express, pre-existing attorney-client relationship with Plaintiff's Counsel.  In determining how much Class Counsel should be paid for the work done on absent Class Members' behalf, it is appropriate to consider what clients agree to pay their lawyers when a direct attorney-client relationship exists.

Here, after arm's-length negotiations with Class Counsel, Plaintiffs agreed Class Counsel would represent Plaintiff on a 40% contingency fee basis.  At the time this agreement was reached, Plaintiffs understood a 40% contingency fee was at or below the market rate.  The typical fee award in class actions today is around 40%. *See* § 1, *supra.*  A fee agreement negotiated at arm's-length in advance is particularly relevant in a contingency case because it reflects the value of the service to be provided before the full difficulty and uncertainty of the case is known and while the risk of a loss still exists.  *See Nieberding v. Barrette Outdoor Living, Inc.*, 129 F. Supp. 3d 1236,

---

[14] These factors are: (5) the customary fee; (6) whether the fee is fixed or contingent; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

1250 (D. Kan. 2015) (percentage in representation agreement between plaintiff and counsel "provides some market context suggesting that a fee award in this range is a reasonable one.").

Another way of comparing the fee request to the market for comparable legal services is to consider awards in similar cases (*Johnson* factor #12). Class Counsel contend that the 35% fee request in this case is consistent with what many federal courts in this Circuit have awarded in other class actions, and with what many federal courts across the country have granted in similar wage and hour lawsuits. *See* § 1, *supra*.

Seven of the *Johnson* factors examine, in different ways, Class Counsel's dedication of time, effort, and skill, and commitment to the case.[15]    As noted above, these factors are less important in a common fund case (rather than a fee-shifting case) because the most important determinant of the lawyer's contribution—and therefore the most important factor in setting the fee—is the outcome the lawyer was able to achieve.  *See Brown*, 838 F.2d at 456.  However, a few of these factors deserve specific attention.

Class Counsel represent that they invested significant time and money in this Action with no guarantee of reimbursement or recovery.  As experienced class action litigators, Class Counsel contend that they knew what needed to be done and what tasks were best calculated to advance the likelihood of certification and to marshal the proof needed to prevail in court or in a favorable settlement.  That said, the Court knows as well as anyone the challenges and complexity of cases like this and the risk Class Counsel undertook in representing the Class.  What *Brown* instructs the

---

[15] These factors are: (1) the time and labor required; (2) the novelty and difficulty of the question presented by the case; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (7) any time limitations imposed by the client or the circumstances; (9) the experience, reputation and ability of the attorneys; and (10) the undesirability of the case.

judge to do is to satisfy himself that the time and effort of Class Counsel contributed to the result achieved for the Class Members. *Brown*, 838 F.2d at 456.[16]

Class Counsel argue that the other *Johnson* factors also support approval of the fee request. Although these factors do not merit as much weight as the results obtained factor, each one is addressed by Class Counsel. Here are Class Counsel's views of each factor applied to this case:

1. **Time and Labor**. This is important in statutory fee shifting lodestar cases, but only important here to show the case was not a lay down winner. The Declaration of Class Counsel shows the law firms invested substantial time and labor in researching, investigating, prosecuting, and resolving this case. Exh. 2 at ¶ 27.

2. **Novelty and Difficulty**. Hybrid FLSA and state wage and hour actions are known to be complex.[17] Plaintiffs decided to bring this case as a hybrid 216(b) collective action and as a Rule 23 action. As a result, Class Counsel were required to marshal evidence and evaluate the Plaintiffs' ability to meet two distinct certification standards—that pertaining to 29 U.S.C. 216(b) FLSA collective actions and that pertaining to Rule 23 Class Actions. Class Counsel contend that their ability to do so in order to draft a motion for conditional certification and for mediation, helped drive settlement in this case. Moreover, Defendant asserted a number of defenses to Class Members' claims that were researched and analyzed for purposes of mediation and would have to be overcome if the case continued to trial.

   Further, the hybrid nature of this case required extensive analysis and planning on their part regarding the formulas and alleged damage distributions, the end results of which are reflected in the proposed Settlement Agreement. Accordingly, this case presented difficult questions which Class Counsel represent they spent significant time navigating, and, in the end, to the satisfaction of the Plaintiffs. Such complex cases require more time and effort on their attorneys' part, and Class Counsel believe that the attorneys should be appropriately compensated for accepting the challenge. *Johnson*,

---

[16] In *Fitzgerald Farms, LLC v. Chesapeake Operating, L.L.C.,* No. CJ-2010-38, 2015 WL 5794008 (Okla. Dist. Ct. Beaver Cty. July 2, 2015), Judge Parsley noted the time-and-labor "factor is the most important in a fee shifting case, its relevance in the contingent fee common fund class actions such as this one is to show that the case was not a lay-down winner where little time was invested and little risk actually assumed." *Id.* at *6. The percentage method for awarding fees rewards good results, promotes efficiency, and aligns the interests of class counsel with the class members. *Id.*

[17] *See Febus v. Guardian First Funding Grp., LLC*, 870 F. Supp. 2d, 337, 340 (S.D.N.Y. 2012) (courts have recognized that FLSA cases are complex and that "[a]mong FLSA cases, the most complex type is the 'hybrid' action brought here, where state wage and hour violations are brought as an 'opt out' class action pursuant to [R]ule 23 in the same action as the FLSA 'opt-in' collective action....").

488 F. 2d at 718.  Despite these hurdles, Class Counsel contends that they obtained a significant amount of recovery for the Class Members, and that this factor thus weighs in favor of the requested 35% fee.

3. **Skill Required Requisite to Perform the Legal Service Properly.** This case presented a complex, challenging set of factual and legal issues, and Class Counsel contend that the case required counsel with special skills in the difficult areas of large-scale class action litigation and wage and hour law.  "[C]lass counsel has extensive experience representing plaintiffs in both wage and hour and class action lawsuits. Accordingly, class counsel was well equipped to address the unique challenges that defendant's anticipated defenses posed to the ability of the plaintiff class to recover in this case.  Class counsel successfully negotiated a structured settlement that provides meaningful recovery for the plaintiff class.  The 'skill' and 'experience' factors therefore weigh in favor of the requested fee award." *Blanco v. Xtreme Drilling & Coil Services, Inc*., 2020 WL 4041456, at \*5 (D. Colo. July 17, 2020).

4. **Preclusion of Other Cases:** Class Counsel represent that their time on this case could have been spent on other worthwhile cases.  Courts in this Circuit have recognized the inherent preclusion of other work implicit in litigating large and complex class actions on behalf of workers in wage and hour cases.[18]  Here, Class Counsel explain that they spent significant time and resources on this case, remuneration for which was entirely contingent on the outcome of this matter. Class Counsel argue that this factor favors approving the 35% fee award because Class Counsel could have spent those hours on guaranteed fee generating work.

5. **Customary Fee.** "Class actions typically involve a contingent fee arrangement because it insulates the class from the risk of incurring legal fees and shifts that risk to counsel."[19]  Plaintiffs and Class Counsel negotiated and agreed to prosecute this case based on a 40% contingent fee.  This fee represents the market rate and is in the "customary fee".  In the proposed settlement agreement, counsel voluntarily reduced its contingency fee request to 35%.  Class Counsel contend that this agreed upon fee supports the reasonableness of the fee factor thus favors a finding that plaintiff's fee request is reasonable.  *Bailes v. Lineage Logistics, LLC,* No. 15-2457-DDC-TJJ, 2017 WL 4758927, at \*6 (D. Kan. Oct. 20, 2017) ("Here, plaintiff and his counsel agreed to a contingency fee arrangement where plaintiff agreed to pay counsel 40% of any

---

[18] *See e.g. Whittington v. Taco Bell of Am., Inc*., 2013 WL 6022972, at \*6 (D. Colo. Nov. 13, 2013) ("Attorneys attempting to handle a large class such as this are precluded by the ticking of the clock from taking certain other cases given that they have decided to take a chance on a possible recovery in a contingent fee case rather than strictly working on paid hourly wages. There is, of course, the possibility in a case of this kind that the lawyer, having given up other cases in order to actively pursue this case, will actually recover no payment for his time and efforts."); *In re Qwest Communications Intern., Inc. Sec. Litig*., 625 F. Supp. 2d 1143, 1151 (D. Colo. 2009) ("It is fair to assume… that lead counsel's efforts on this case could have been devoted to other cases which may have been devoted to tother cases which may have proven worthwhile. This assumption, however, does not weigh heavily in my analysis.").

[19] *Nieberding v. Barrette Outdoor Living, Inc.*, 129 F. Supp. 3d 1236, 1250 (D. Kan. 2015) (citing *Freebird, Inc.*, 2013 WL 1151264, at \*4).

common-fund-settlement recovery. In the proposed settlement agreement, counsel voluntarily reduced its contingency fee request to 33%. Factor [five] thus favors a finding that plaintiff's fee request is reasonable."). As established above, Class Counsel argue that the 35% requested fee award is well within the customary fee awarded in wage and hour class action litigation.

6. **Whether the Fee is Fixed or Contingent**. Class Counsel represent Plaintiffs on a contingency fee basis. The representation agreement entered into between Class Counsel and Plaintiffs provides that, in the event Plaintiffs prevailed, counsel would receive 40% of the overall recovery. Had Plaintiffs not resolved their claims or prevailed at trial, counsel would have received nothing. Courts consistently recognize that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees: If Class Counsel lose class certification or the merits, that is thousands of hours and many dollars down the drain. Even winning, class counsel may not get paid at all.[20] Although Class Counsel argue that they were able to achieve an excellent result for the class, achieving the outcome was anything but certain when they agreed to take the case on a contingency fee basis.[21] "This factor weighs in favor of the requested attorneys' fees award, because "[s]uch a large investment of money [and time] place[s] incredible burdens upon ... law practices and should be appropriately considered." *Acevedo,* 2019 WL 6712298, at *5 (collecting cases).

7. **Time Limitations Imposed by the Client or Circumstances.** The "risk for Class Counsel when it committed to a case that would be vigorously litigated for years" is the critical consideration when evaluating this factor. *In re N.M. Indirect Purchasers Microsoft Corp*., 2007-NMCA-007, ¶ 84. "It is not the limit placed on counsel's time that is significant…. Rather, it is class counsel's commitment to represent the Class, despite the probability of years of litigation" that is significant to this factor. *Id.* Here, Class Counsel represent that they committed to this case knowing that it could be vigorously fought for years and cause significant limitations on Class Counsel's two small wage and hour firms, which collectively employ five attorneys, from representing the class. Had the settlement not occurred, the case may have taken many more years to get to trial; it also avoids potential decertification issues and appeals on the merits that would have been taken following trial. Accordingly, Class Counsel contend that this factor weighs in favor of approving the 35% fee because Class Counsel have committed themselves to representing the Class, despite the known probability of years of litigation and potential appeals. *Id.*

8. **Amount in Controversy and Result Obtained**. As detailed above, Class Counsel's position is that this is the most significant factor in awarding attorneys' fees in a common fund case. Here, Class Counsel contend that they obtained a substantial

---

[20] *See, e.g., Schell v. Oxy USA, Inc.,* 814 F.3d 1107, 1112 & 1125-26 (10th Cir. 2016) (despite winning summary judgment in favor of plaintiff class after seven years of litigation, no attorney's fee was awarded).

[21] *In re Checking Account Overdraft Litig*., 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011) ("'Undesirability' and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight").

payment on behalf of the 597 Class Members.  Exh 2., ¶ 21  "Class counsel obtained this result despite serious questions as to whether the class could be certified under Fed. R. Civ. P. 23, whether the class could ultimately prevail on the merits of its claims, and what amount of damages would be available.  Given the risks involved, the Court finds that the relief provided by the settlement represents an excellent result for the settlement class."  *Blanco v. Xtreme Drilling & Coil Services, Inc*., 16-CV-00249-PAB-SKC, 2020 WL 4041456, at *6 (D. Colo. July 17, 2020) (citing  *Tennille v. W. Union Co.*, No. 09-cv-00938-JLK-KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (recognizing that prospective relief contributes to the "real and actual value" of a settlement)).

9.  **Experience, Reputation, and Ability of Counsel**.  This factor is intended to reward counsel for devoting the talent, experience, and specialization necessary to successfully try a complex class action case.  *Johnson*, 488 F. 2d at 718-19.  Class Counsel represent that they have extensive experience and demonstrated ability litigating wage and hour collective and class actions.    Class Counsel contend that their knowledge and experience significantly contributed to a fair and adequate settlement of this litigation. Class Counsel's position is that the dedication of their expertise to this litigation, and the skill required to obtain the substantial settlement fund created for the Class, supports a 35% fee award.

10.  **Undesirability of the Case.**[22]  Because Plaintiffs did not have the resources to hire counsel, Class Counsel contend that this case could only have been litigated via a contingency fee agreement.  The "undesirability" of this case to the bar is heightened by the complexity of the legal issues involved and because, under Defendant's theory of the case, Plaintiffs and the Class members would have been owed zero.  Moreover, the legal theories involved required substantial expertise in the wage and hour field— which most attorneys lack—which would have prevented them from understanding the nuances of the arguments asserted, determining whether the Plaintiffs may have had viable claim, or evaluating the potential damage awards available to the Class Members in this case.  Had the case not settled, Plaintiffs would have litigated this case without any promise of success and a substantial chance of receiving nothing in the case.[23] Accordingly, Class Counsel contend that this factor weighs in favor of approving the

---

[22] "Undesirability' and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight" *In re Checking Account Overdraft Litig*., 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011).

[23] *Acevedo,* 2019 WL 6712298, at *5 ("[T]he time and effort that this case has taken and the complexity of the issues would make it undesirable to many attorneys.  Under Defendant's theory, the Plaintiff and Class Members would be owed zero. Furthermore, the legal theories involved required substantial expertise in the wage and hour field.  Many attorneys would not have understood the nuanced arguments asserted, nor would they have been able to discern whether the Plaintiff even had a viable claim.  Additionally, other lawyers may not have had the expertise to ascertain and evaluate the possible damages awards available to the Class Members in this case.  Thus, the work of Plaintiff's Counsel provided a significant benefit to the Class Members.  Had this case not settled, Plaintiff's Counsel would have vigorously litigated the case without any promise of success and compensation.  Yet, at every step of the litigation, Defendant could have succeeded.  I accordingly find that this factor weighs in favor of approving the requested award for attorneys' fees and costs.").

requested 35% fee.

11. **Nature and Length of Professional Relationship with Client.**  Class Counsel's position is that this factor is meant to reflect any discounted rate that a lawyer might ordinarily charge a long-standing client from whom the lawyer might expect continued or repeated business.  *Johnson*, 488 F. 2d at 719.  Here, Class Counsel had no previous relationship with the class or the class representatives.  However, regarding the nature of the relationship between Plaintiffs and their counsel, Class Counsel note that the representation agreement entered into between counsel and Plaintiffs entitled Class Counsel to a 40% of an overall recovery.  Counsel agreed to seek the 35% award in the interest of equity and to assist in achieving a settlement.

12. **Awards in Similar Cases**.  Class Counsel contend that a review of fee awards in other class action lawsuits, and wage and hour lawsuits in particular, establishes that a 35% fee is well within the range of such awards**.** *See* #5, *supra*;

Class Counsel's position is that because the *Johnson* factors weigh in favor of approving the specific percentage requested as the fee award and the percentage is well within the general approved range for similar complex class action cases, the request for 35% of the common fund is reasonable and should be approved by the Court.  Defendant does not oppose their request.

## VII.   CONCLUSION

For the reasons set forth *supra*, the Parties request that the Court (1) approve the Settlement Agreement as fair, reasonable, and adequate; (2) allow the Parties to file the Settlement Agreement, if necessary, with all settlement payment amounts redacted; (3) award attorneys' fees in the amount of 35% of the common fund; and (4) enter the proposed Interim Approval Order which will become the Final Approval Order on November 26, 2020, provided no governmental agency raises an issue with the settlement in response to the CAFA notice applicable to this case.